■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GREGORY HAMPTON, Appellant. [606 NYS2d 628] —Judgment of the Supreme Court, Bronx County (Martin Marcus, J.), rendered December 3, 1991, convicting defendant, upon his plea of guilty, of two counts of attempted murder in the second degree, robbery in the first degree, criminal possession of a weapon in the second degree, and criminal possession of of a controlled substance in the third degree, and sentencing him, as a second felony offender, to concurrent indeterminate terms of imprisonment of from 10 to 20 years on each of the attempted murder and robbery counts, and from 4 to 8 years on each of the criminal possession of a weapon and controlled substance counts, reversed, on the law, and the physical evidence, lineup identification and defendant's statements suppressed, and the matter remanded to Supreme Court for further proceedings in accordance with this memorandum.

After midnight on May 30, 1990, New York City Police Officers Kevin McGarvey and John Kennedy were on uniformed burglary patrol in an unmarked police car. They observed a gypsy cab leave the Major Deegan Highway at Fordham Road carrying three male passengers in the back seat. According to the testimony of Officer McGarvey at the suppression hearing, the cab was being driven in an "erratic

manner * * * stopping in the middle of the block, starting to make turns and then just kept going like he was lost." The erratic driving of the taxi caused the officers to suspect that a robbery might be taking place. The witness explained that, because there had been a recent rash of robberies of both medallion and gypsy cabs in the area, during which several drivers had been killed, the drivers had consented to submit to routine police stops for their safety. The officers had therefore followed the cab for several blocks, maintaining no more than a three-car interval between the respective vehicles.

The cab pulled to the curb and stopped at the corner of Walton Avenue and East 184th Street, an isolated residential area. The officers stopped their vehicle approximately two car lengths behind it and waited for a few minutes until they saw defendant emerge from the rear, passenger-side door, carrying a thin, white plastic bag that appeared to be "weighted" down by a heavy object. At that point, the officers left their vehicle with guns drawn and approached the cab. Officer McGarvey told defendant, who was walking towards him, to stop, and defendant immediately complied. As he neared defendant, gun in hand, he could see the outline of an Uzi-type machine gun through the plastic bag and told defendant to put the bag on the ground. Once defendant complied, the bag fell open, exposing the gun to view. Officer McGarvey told his partner about the weapon, and Kennedy ordered the other passengers out of the cab, whereupon the two men fled. The police officers did not pursue them but remained to arrest defendant.

After defendant was taken into custody, the cab driver told the officers that he had been driving erratically because he was nervous about driving through the area. The officers searched defendant, the bag and the cab, recovering the Uzi machine gun and 29 live, nine-millimeter rounds from the bag, narcotics from appellant's jacket, and two more guns from the floor in the rear of the cab. Later, during an inventory search at the Precinct House, police recovered jewelry, $4,701 in cash, and registration and insurance cards, bearing the name of a woman that defendant initially claimed to be his girlfriend, from defendant's person.

Following his arrest, defendant waived his *Miranda* rights and was identified at a line-up held in connection with two homicides, one of which involved the woman whose registration and insurance cards were found in defendant's possession. Officer McGarvey testified that, although the cab was being driven erratically, he did not witness any unusual behavior or furtive movements from the passengers and could not see

what was going on inside the cab. He also testified that he and Officer Kennedy drew their guns before he actually saw defendant's gun or even the outline of the gun through the plastic bag. Supreme Court sustained the seizure of the guns, ammunition, narcotics, jewelry, documents and money, together with defendant's statements and the lineup identification.

At issue on this appeal is the propriety of police conduct in seizing defendant, the guns, and the other contraband found in defendant's possession. Whether the police officers acted reasonably or in violation of defendant's Fourth Amendment rights depends on whether they were justified in approaching to question defendant with their guns drawn.

The conduct of the police officers in this case constitutes an impermissible intrusion upon the privacy and security of defendant (People v Stewart, 41 NY2d 65, 69-70), requiring exclusion of the evidence seized (People v De Bour, 40 NY2d 210, 217). There is no doubt that the erratic driving of the cab in an area known for its high incidence of cab driver robberies and homicides was "sufficient to arouse the officers' interest" (People v De Bour, supra, at 220) and to justify "[t]he minimal intrusion of approaching to request information * * * when there is some objective credible reason for that interference not necessarily indicative of criminality" (40 NY2d, supra, at 223).

The People, however, argue that the officers properly believed that the occupants of the taxi were engaged in criminal activity. They note that the cab was being driven erratically, late at night, in an isolated area that was known to the arresting officers to have a high incidence of cab driver robberies and homicides. The People emphasize that the situation was sufficiently acute that Bronx County cab drivers had consented to submit to routine stops by the police in the effort to ensure their safety. Finally, they note that defendant waited several minutes after the cab came to a stop before getting out, and that he carried a bag appearing to be "weighted" down by a heavy object.

Be that as it may, as Officer McGarvey testified, the erratic driving of the cab was entirely consistent with the driver's being lost. While the cab was in an area known for its high incidence of crime against cab drivers, location alone does not justify police intrusion against citizens who happen to live, work, or travel in such " 'high crime areas' " (People v Howard, 147 AD2d 177, 182, appeal dismissed 74 NY2d 943).

The officers in this case were not making a routine stop of the cab, as contemplated by the cab drivers' agreement, and in fact waited until the cab was stationary for several minutes and defendant had emerged before they approached. It is not asserted that there was anything unusual about the manner in which defendant alighted from the cab. Finally, the plastic bag, noted to be "weighted down", could have contained any number of heavy articles and does not, by its nature, constitute a container indicative of contraband *(compare, People v Leung,* 68 NY2d 734, 735 [defendant seen passing brown envelope resembling "three dollar bags" used in drug transactions]).

"[I]nnocuous behavior alone will not generate a founded or reasonable suspicion that a crime is at hand" *(People v De Bour, supra,* at 216). Defendant's behavior was susceptible of an innocent interpretation, there was no reasonable suspicion that a crime was being committed, and no weapon was in sight. The police officers therefore had no reason to assume that defendant was armed. While they might have been apprehensive under the circumstances encountered, fear or suspicion does not constitute an adequate basis for forcible seizure unless it is reasonable *(People v Howard,* 50 NY2d 583, 590, *cert denied* 499 US 1023). Although the circumstances in this case were sufficient to arouse interest and justify a request for information, they fell short of establishing the requisite reasonable suspicion that defendant had committed, was committing, or was about to commit a crime so as to authorize a forcible stop and detention (CPL 140.50; *People v De Bour, supra,* at 223). Even assuming that the officers were justified in exercising their common-law right to inquire, entitling them to interfere to the extent necessary to gain information short of a forcible seizure, defendant's detention at gun-point removed the encounter from the category of either a mere request for information or a common-law right to inquire.

The record fails to support the People's contention that defendant was not forcibly detained. Officer McGarvey told defendant to stop, and both officers approached defendant with their guns drawn, transforming the confrontation "from a merely unsettling one to an intimidating one" *(People v Hollman,* 79 NY2d 181, 192). It cannot be said that the approach of police officers with guns drawn constitutes an encounter "devoid of harassment or intimidation" *(People v De Bour, supra,* at 220). Defendant was physically and constructively detained by virtue of the significant limitation of

his liberty of movement, and was therefore "seized" within the meaning of the Fourth Amendment *(People v Cantor,* 36 NY2d 106, 111). Concur—Murphy, P. J., Sullivan, Rosenberger and Rubin, JJ.

Ross, J., dissents in a memorandum as follows: I would affirm. The majority states that "[t]here is no doubt that the erratic driving of the cab in an area known for its high incidence of cab driver robberies and homicides was 'sufficient to arouse the officers' interest' ". Given the situation described by the majority "the level of police intrusion was an appropriate response to the observations and beliefs of the officers involved" *(People v Leung,* 68 NY2d 734, 736). If the officers were entitled to approach the cab based upon their suspicion that the cab driver might be the victim of a robbery or worse, it is naive and dangerous to expect them to approach the vehicle with holstered weapons.