OPINION OF THE COURT
John M. Leventhal, J.
The defendant John Mallet stands accused inter alia of robbery in the second degree. The defendant was granted a combined Mapp-Wade hearing which was conducted before this court. The People called two witnesses, Transit Police Officers Balsamo and Burrell. The defense called no witnesses. Certain transit communications tapes were destroyed by the transit communications division. A Kelly hearing (People v Kelly, 62 NY2d 516) was also held. Based upon the credible testimony of record, the court makes the following findings:
FINDINGS OF FACT
On August 9, 1994 at approximately 12:30 a.m. New York City Transit Police Officer Balsamo just entered onto the northbound platform of the D-train at the Kings Highway station in Brooklyn. Officer Balsamo had been stationed by the token booth entrance for more than 20 minutes prior to taking his position on the platform. He observed four black males in their late teens or early twenties at the south end of the northbound platform. One of the four drew Officer Balsa- *1011 mo’s attention as the young man was bent over a bag and was seemingly placing items in the bag.
At 12:32 a.m., Officer Balsamo received a radio communication directing him to proceed to the Avenue U station to meet a robbery victim, Tak Yuen, by the token booth. Police Officer Balsamo crossed over to the southbound platform to await the D-train to take him one stop to the Avenue U station. As he was waiting for the train, Officer Balsamo observed the four young men board a northbound D-train.
Officer Balsamo met the victim who told the officer that he was just robbed at the Kings Highway station by three young black men. The victim described three of the perpetrators. The description of the first perpetrator was of a male black about 21 years old, 5 feet, 10 inches tall, wearing a black tee shirt and black jeans. The officer took down the description of the first perpetrator only as he recognized that the description of this person matched the description of the person that attracted his attention at the Kings Highway station. A description of a second perpetrator was given over the radio as a black male in his teens, white tee shirt with blue stripes and black jeans. Immediately, at approximately 12:40 a.m., Officer Balsamo radioed transit communications to hold the nearest northbound D-train when it arrived at the next stop. At 12:46 a.m., the train pulled into the Beverly Road station. Communications had notified the conductor not to open the doors and not to leave the station. At 12:43 a.m. the victim, accompanied by Officer Balsamo, a transit sergeant and another transit officer proceeded by automobile to the Beverly Road subway station. They arrived at the Beverly Road station at 1:08 a.m., where they met plainclothes Transit Police Officers Burrell and Smith.
The victim, accompanied by the transit entourage, walked on the well-lit platform alongside the first car of the 10-car lighted train and proceeded to view the occupants inside from the platform walking from car to car. The doors of the train remained closed upon its arrival at the Beverly Road station. When the victim viewed the occupants through the subway windows in the sixth or seventh car, at 1:11 a.m., he identified two of the perpetrators who robbed him. The defendant was one of those identified.[1] The doors of that particular subway car were opened, the defendant was arrested and searched for *1012 weapons. At the transit station, $8 were found on the defendant as a result of the inventory search of the defendant.
There were over 100 persons on the six or seven subway cars viewed by the victim. There were approximately 12-15 people on the subway car in which the defendant was riding. There were also other groups of young black males in the various subway cars, whose occupants were previously viewed. There were 10 young black males in the subway car in which the defendant was riding. Officer Balsamo testified that he did not tell the victim that he saw a person who matched the description given by the victim, nor did he tell the victim that the perpetrators were on the train.
At the transit precinct the victim informed Police Officer Burrell that in addition to currency, the perpetrators forcefully took the victim’s black bag.
The tapes of the transit communications including that of Officers Balsamo and Burrell were destroyed in the ordinary course of transit business after 90 days. The defendant’s attorney failed to subpoena the Transit Authority for the production of these tapes. The District Attorney’s office subpoenaed the New York City Police Department, not the New York City Transit Police Communications Division on September 15, 1994 and again on November 4, 1994, both within 90 days, but addressed to the wrong agency. A Kelly hearing was held to determine what sanctions, if any, would be imposed.
CONCLUSIONS OF LAW

Rosario Violation Claim

A Kelly hearing (62 NY2d 516, supra) was held to determine the appropriate sanction, if any, to impose against the People for their failure to preserve the tapes of the various transit communications relating to witnesses at the Dunaway/Wade hearing, namely Transit Police Officers Balsamo and Burrell.
The violation herein is a case where Rosario evidence has been destroyed and cannot be produced. (See, People v Haupt, 71 NY2d 929.) "Just as the People have a duty to produce Rosario material, they also have a correlative 'obligation to preserve evidence until a request for disclosure is made.’ (People v Kelly, 62 NY2d, at 520; see also, United States v Bryant, 439 F2d 642; People v Saddy, 84 AD2d 175).” (People v Martinez, 71 NY2d 937, 940.)
Here the People "attempted” due diligence by twice serving a subpoena on the New York City Police Department Commu *1013 nications Division in a timely fashion. However, the proper agency to be served was the Transit Police Department. Although no bad faith was shown by the People, the People were nonetheless negligent.
The same law firm represented the defendant from arraignment to the present. At no time did the defendant’s counsel subpoena the transit police for the pertinent tapes.
A court’s failure to impose a sanction has been upheld where absent prejudice to the defendant, a 911 tape was routinely destroyed and said destruction was not due to a lack of due diligence by the People. (People v Hyde, 172 AD2d 305.) However, a sanction is required after a 911 tape is destroyed after defendant’s request for such tape (People v Parker, 157 AD2d 519 [reversal required]), but not if routinely destroyed before defendant’s request. (People v Diggs, 185 AD2d 990.) The defendant here may be prejudiced by the loss or destruction of Rosario material as it related to the description of the perpetrators. The failure to impose a sanction may be an abuse of a court’s discretion even where the defendant failed to subpoena the pertinent tapes prior to their destruction as the People, albeit in good faith, subpoenaed the incorrect agency. The appropriate sanction is left to the sound discretion of the hearing court after considering all relevant factors. (People v Martinez, 71 NY2d 937, supra.)
However, as explained infra, any sanction imposed may be inappropriate if the defendant is found not to have been seized by the police. Nonetheless, the court imposes the following sanction: An adverse inference will be drawn by the hearing court in that the descriptions given by Transit Officers Balsamo and Burrell will be found to have varied somewhat with that contained in the destroyed tapes. This adverse inference has been factored in the Dunaway/Wade findings below and in the facts as stated above. In addition, Officer Balsamo is precluded from identifying defendant as the person he had observed at the Kings Highway station.[2] Nonetheless, subject to any and all other proper objections at trial, if any, Officer Balsamo is not precluded from testifying that the defendant upon his arrest at the Beverly Road station was wearing the same clothes as the person observed by him at the Kings Highway station.

*1014
Dunaway/Wade Issues

A preliminary issue of first impression is whether the detaining of a public train at a regularly scheduled stop or 25 minutes with the doors kept closed constitutes a seizure or stop of the occupants therein, particularly the defendant.
It is clear and long well established that the stop of an automobile is a seizure of the person governed by the constitutional strictures against unreasonable searches and seizures. (See, People v Sobotker, 43 NY2d 559, 563; People v Scott, 63 NY2d 518; People v John BB., 56 NY2d 482, cert denied 459 US 1010; People v Ingle, 36 NY2d 413; People v Cantor, 36 NY2d 106; People v Rosario, 94 AD2d 329; People v Flanagan, 56 AD2d 658; Berkemer v McCarty, 468 US 420; Delaware v Prouse, 440 US 648; United States v Martinez-Fuerte, 428 US 543, 556; United States v Brignoni-Ponce, 422 US 873, 878-882.)
Even before the pronouncement of the Court of Appeals in People v Millan (69 NY2d 514, 520 [1987]), the Second Department had recognized that a passenger in a car has standing to challenge the admissibility of any evidence seized as a result of an alleged illegal stop. (People v Smith, 106 AD2d 525.)
Does the same rule apply to the detaining of a public train when the occupants are unaware of the purpose of the delay? This court answers this question in the negative.
A train or subway, unlike an automobile, goes on a predesignated path stopping at various stations. Unlike a car, the train’s movement was not being altered. It stopped at a designated station, Beverly Road, and remained at the station for approximately 25 minutes with the doors unopened. The cause for the delay was unannounced and such delays are not uncommon in the New York subway experience.
As there was neither physical force nor submission to authority, there was no seizure of the defendant under Federal law. (See, California v Hodari D., 499 US 621, 626.) The test whether a seizure or detention of a person has occurred under the Fourth Amendment is "if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.” (United States v Mendenhall, 446 US 544, 554.) Our Court of Appeals has framed the issue as "whether defendant’s liberty of movement was interrupted.” (People v Bora, 83 NY2d 531, 535; *1015 People v Cantor, 36 NY2d 106, 111 [seizure of the person for constitutional purposes is a significant interruption of an individual’s liberty of movement].) The Court in Bora clarified this issue as being defined by an objective test: "The test is whether a reasonable person would have believed under the circumstances, that the officer's conduct was a significant limitation on his or her freedom.” (83 NY2d, at 535; see also, People v Yukl, 25 NY2d 585, 589 [in Miranda Fifth and Sixth Amendment context], applied in People v Hicks, 68 NY2d 234, 240 [Fourth Amendment context].) A reasonable person, under the circumstances herein, would merely have believed that there was a train delay. The fact that the doors remained closed did not prevent the subway riders from moving about within the train. (See, Immigration & Naturalization Serv. v Delgado, 466 US 210, 218.) There was no police action or police interference known by the passengers.
An automobile and its movement is clearly different from and distinguishable from a train and its movement. Nonetheless, the detaining of a train being motionless at its designated station is analogous to the detaining of a parked vehicle, not the stopping of a moving vehicle. Thus there is no need to determine whether the police possessed the necessary predicate to warrant a stop of the train as the train had already stopped. (See, People v Elsberry, 157 AD2d 848; People v Fabian, 178 AD2d 544.)
Having found that no seizure occurred, no Fourth Amendment analysis is required to determine whether the police action was proper. However, assuming arguendo that the detaining of the train is considered a stop or seizure of the defendant requiring reasonable suspicion (People v Harrison, 57 NY2d 470, 476; People v Sobotker, 43 NY2d 559, supra), such intrusion was nonetheless proper and lawful. Whereas here the victim provided a description of the robbery suspect that matched the description of a person the officer had seen minutes ago board a northbound D-train, the officer had reasonable suspicion to order the stop of the D-train several stations from the crime scene station and within 20 minutes of the crime. "There were 'articulable facts’ justifying the investigatory stop.” (See, People v Cruz, 169 AD2d 836, 837; People v Hicks, 68 NY2d 234, 238; People v De Bour, 40 NY2d 210; People v Clark, 172 AD2d 679, 680.)
*1016 It cannot be denied that Officer Balsamo possessed reasonable suspicion[3] as his independent observation of one of the perpetrators corroborated the description provided by the victim. The police officer knew that a person matching the description of one of the perpetrators was on the train. As the officer had reasonable suspicion that the perpetrator committed the robbery, then he also possessed reasonable suspicion to stop the train.
Where the purpose of police action is to confirm or to dispel reasonable suspicion quickly and other factors are also present, e.g., the authorities knew a crime had actually been committed, the time elapsed from the commission of the crime was small, the distance from the crime scene to the place of detention was close, and there was no proof of significantly less intrusive measures available to accomplish the same purpose, the scope of police action should be upheld. (People v Hicks, 68 NY2d, at 243, supra.) Absent extraordinary circumstances, all prompt on-the-scene showups are permissible because they are conducted close in time to the crime and conducted at or near the crime scene. (People v Duuvon, 77 NY2d 541 [1991].)
Here, the defendant was not identified in a one-on-one showup or even in a police selected lineup. Defendant was identified in a natural randomly selected corporal array consisting of over 100 persons containing various groups of young black males in the six or seven subway cars observed. In addition, there were approximately 12-15 persons in the subway car in which the defendant was present. Such identification, although police arranged (see, People v Dixon, 85 NY2d 218, supra), was not police selected. The identification was not unduly suggestive but rather approaches the optimum in fairness. Moreover, the approximately 25-minute detention of the train and its occupants was temporary and lasted no longer than was necessary to effectuate the purpose of the stop. (See, Florida v Royer, 460 US 491, 500.) The Supreme Court has declined to specify a time limit beyond which a detention based on reasonable suspicion becomes unlawful. (See, United States v Sharpe, 470 US 675, 686; United States v Place, 462 US 696, 709.) Courts have consistently upheld *1017 periods of detention less than one hour,[4] e.g., in People v Harris (186 AD2d 148 [30 minutes]); People v Pinkney (156 AD2d 182 [30 minutes]); People v Lyng (104 AD2d 699 [less than one hour]); People v Thompson (160 Misc 2d 579 [35 minutes]); United States v Davies (768 F2d 893, 902 [45 minutes]).
The exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary on-the-street detention accompanied by a frisk for weapons involved in Terry v Ohio (392 US 1). If the purpose underlying a Terry stop, namely investigating possible criminal activity, is to be served, the police must under certain circumstances be able to detain an individual for longer than the brief time period involved in Terry. (People v Hicks, 68 NY2d, at 240-241, supra, citing Michigan v Summers, 452 US 692, 700, n 12; Dunaway v New York, 442 US 200, 219.)
As either no stop was involved or that assuming arguendo a stop occurred it was based on reasonable suspicion, the identification was lawful and proper and not unduly suggestive. Therefore, once the defendant was identified by the victim, the police had probable cause to arrest the defendant. The subsequent search of the defendant was proper as incident to a lawful arrest. The station house search was likewise proper.
The motion to suppress the identification of the defendant on the subway train and to suppress physical evidence is denied.

. One perpetrator is 15 years old. His ease was transferred from Criminal Court to Family Court and the record sealed.

. Officer Balsamo’s identification at the time of the defendant’s arrest at the Beverly Road station is precluded for lack of timely identification notice and such notice was required. (See also, People v Dixon, 85 NY2d 218.)

. Reasonable suspicion is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe that criminal activity is at hand (People v Cantor, 36 NY2d 106, 112-113, supra.)

. See, Kamins, New York Search and Seizure, at 142 (1995).